

**In The**
**Court of Appeals**
**Sixth Appellate District of Texas at Texarkana**

_____

No. 06-11-00121-CV

_____

IN THE INTEREST OF I.H.R., A CHILD

On Appeal from the County Court at Law
Lamar County, Texas
Trial Court No. 78772

Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Chief Justice Morriss

MEMORANDUM OPINION

When Amanda Gail Riley's daughter, I.H.R., was born July 28, 2009, Amanda's stepfather, radiologist Billy Parkhill, was present and saw I.H.R.'s poor post-partum condition, including her seizure activity. At the trial of this parental rights termination suit filed by Amanda's sister, Janna Davis, Parkhill testified, in part to what he saw and in part to the meaning of the medical records of Amanda and I.H.R., and Amanda's parental rights to I.H.R. were terminated. On appeal, Amanda complains about Parkhill's testimony and argues that the evidence is insufficient to prove that she endangered the physical or emotional well-being of I.H.R.[1] We affirm the trial court's judgment because (1) no error was preserved concerning Parkhill's testimony and (2) sufficient evidence shows Amanda endangered I.H.R.[2]

*(1)    No Error Was Preserved Concerning Parkhill's Testimony*

Parkhill testified, before any objection had been lodged, that the seizures experienced by I.H.R. were "due to drugs in her system." I.H.R.'s medical records were also admitted through

---

[1]After I.H.R.'s father, Ricky Riley, executed an affidavit of relinquishment of parental rights, the trial court terminated his parental rights in a suit filed by the Texas Department of Family and Protective Services (TDFPS) May 26, 2010. Davis intervened in that suit and was appointed sole managing conservator of I.H.R. while Amanda was appointed possessory conservator with rights to supervised visitation. On October 15, 2010, Davis sought to terminate Amanda's parental rights to I.H.R. on the grounds that she (1) knowingly placed or knowingly allowed the child to remain in conditions or surroundings that endangered her physical or emotional well-being, (2) engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangered her physical or emotional well-being, or (3) was the cause of I.H.R. being born addicted to alcohol or a controlled substance other than a controlled substance legally obtained by prescription.

[2]Amanda does not appeal the finding by the trial court that termination was in the best interest of I.H.R.

2

him without objection.[3]  Parkhill explained he was familiar with the care and treatment that would be necessary for I.H.R. "[i]n a general way medically."  At this point, Amanda's counsel, Chris Fitzgerald, objected, and the following exchange occurred:

MR. FITZGERALD:  -- if she's going to qualify him as an expert -- or where we're going with this testimony.  I have no problem with the introduction of medical records, but I don't feel it appropriate for Mr. Parkhill to opine as to --

THE COURT:  Well, now, it's my understanding, just so I'm correct, that Dr. Parkhill is, in fact, a medical doctor.  Doctor, do I understand you -- you have -- you have an M.D. degree --

WITNESS:  I do --

THE COURT:  -- is that correct?

WITNESS:  -- yes.

THE COURT:  And you'll be testifying from these records in a -- in a general sense --

WITNESS:  Yes.

THE COURT:  -- is that correct?

WITNESS:  Yes.

THE COURT:  Am I -- am I correct, Ms. Hodgkiss?

MS. HODGKISS:  That's correct, Your Honor.

---

[3]I.H.R.'s medical records were filed with the court with an affidavit of authentication executed by the director of health information management for Medical City of Dallas.  They reflected that I.H.R. suffered "in utero methadone exposure," convulsions, and experienced newborn drug withdrawal syndrome.  On the day after I.H.R.'s birth, Amanda tested positive for "cannabinoids, methadone, diphenhydramine, lidocaine, fluoxetime, promethazine, and mepivacaine."  I.H.R. also tested positive for methadone and marihuana.  On August 4, 2009, Amanda tested positive for "THC, Opiates, Barbiturates, [and] methadone."  While it appears the methadone was prescribed to Amanda, Davis believed she was taking excess doses.

On voir dire, Amanda's counsel established that Parkhill was not a pediatrician, that he does not normally encounter children that have been born with drugs in their system, and that he had an interest in I.H.R. However, Parkhill stated, "I will look at the medical records as a doctor, but I don't know that I can put a spin on it. I mean, the medical record is what it is. . . . I can interpret the medical record. That's -- I think I have an ability to do that." Counsel replied, "Right. And I don't -- I don't question your ability as a physician, sir. I don't." Although it was established that Parkhill was an interested witness, the following exchange clarified the nature of the testimony:

> Q.       But as it relates to the medical record, other than I guess explaining what is in the record, is that -- is that -- is that what you would enlighten us to?
>
> A.       I would be happy to do that.
>
> MR. FITZGERALD:   Okay.   Well, Judge, we'll stipulate to the records, and -- but I do object to Mr. -- Dr. Parkhill.

The court allowed Parkhill to continue to testify, finding "that he is qualified to read these medical records and any bias or motive that he might have I think would go to the weight on his testimony rather than the admissibility of the same."

On appeal, Amanda does not complain of Parkhill's ability to read and interpret the medical records generally.[4] Amanda argues that Parkhill was not a qualified witness "on the subject of the medical records of Appellant and the child."

---

[4]Amanda was required to object below if she believed Parkhill's testimony exceeded the scope of reading the medical records.

4

"To preserve error as to the admission of evidence, a party must make a timely objection and state the specific grounds for the desired ruling, if the grounds are not apparent from the context." *Moon v. Spring Creek Apartments*, 11 S.W.3d 427, 432 (Tex. App.—Texarkana 2000, no pet.); *see* TEX. R. APP. P. 33.1. "If a party fails to make a timely and specific objection, error is not preserved and the complaint is waived." *Id.* (citing *Bushell v. Dean*, 803 S.W.2d 711, 712 (Tex. 1991) (op. on reh'g)). From this record, it appears that counsel's objection was mixed: partly a challenge to Parkhill's lack of expertise in pediatric matters or in matters related to the effects of drugs on unborn or newly born children and partly his potential interest and bias.[5] We do not read Amanda's challenge as an attack on Parkhill's qualifications to read and interpret the medical records generally.

Next, from the trial court's questioning, it appeared that the intent was to have Parkhill testify from the medical records only in a general sense. On appeal, Amanda complains that Parkhill was not qualified to testify that her marihuana use "caused the child to exhibit withdrawal symptoms." This objection was not preserved below. An objection must be timely to preserve error. TEX. R. APP. P. 33.1. Parkhill testified from the outset that the seizures experienced by I.H.R. were "due to drugs in her system." Amanda's subsequent objection stated above, even if it was specific enough to preserve any complaint on appeal, was untimely as it relates to the

---

[5]Amanda does not complain on appeal about the admission of any specific portions of Parkhill's testimony. Also, no further objection to Parkhill's testimony was made during trial, other than an overall, unspecified objection to his offering opinion testimony as an expert witness.

connection between drugs in Amanda's system and I.H.R.'s seizures.[6]  The later, more explicit, testimony by Parkhill that I.H.R. was born with marihuana in her system, endangering her physically, also came in without objection.

We overrule this point of error.

*(2)     Sufficient Evidence Shows Amanda Endangered I.H.R.*

To terminate an individual's parental rights to his or her child,[7] Davis had to prove, and the trial court was required to find, by clear and convincing evidence   (1) that the parent has engaged in one of the statutory grounds for termination and (2) that termination is in the child's best

---

[6]After the general objection to Parkhill as an expert was overruled, albeit limited to "reading" the medical records, Parkhill testified to a number of arguably "expert" matters beyond the scope of the matters found in the medical records, without objection:  (A) It would not be normal for a hospital to give a newborn child marihuana or methadone, so I.H.R. must have been born with them in her system; (B) those drugs commonly cause seizures in a newborn from withdrawal; (C) such seizures can cause permanent damage such as learning disabilities, severe mental deficiencies, and neurological problems; (D) I.H.R. was so bad, she had to be given morphine to stop the seizures; and (E) drug addiction frequently causes the developmental delays found in I.H.R.

[7]A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right."  *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003).   Decisions from Texas courts show great respect for the biological bond between parent and child, recognizing "that the natural right which exists between parents and their children is one of constitutional dimensions."  *In re J.W.T.*, 872 S.W.2d 189, 194–95 (Tex. 1994) (quoting *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976)); *In re J.J.*, 911 S.W.2d 437, 439 (Tex. App.—Texarkana 1995, writ denied).   However, the Texas Supreme Court has also recognized that "the rights of natural parents are not absolute; protection of the child is paramount. . . .   The rights of parenthood are accorded only to those fit to accept the accompanying responsibilities."  *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003) (citing *J.W.T.*, 872 S.W.2d at 195).   The child's emotional and physical interests must not be sacrificed merely to preserve parental rights.  *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).

A termination case seeks to erase parental rights permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit.  TEX. FAM. CODE ANN. § 161.206(b) (West 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985).   We strictly scrutinize termination proceedings in favor of the parent.  *In re S.K.A.*, 236 S.W.3d 875, 900 (Tex. App.—Texarkana 2007), *pet. denied*, 260 S.W.3d 463 (Tex. 2008) (citing *Holick*, 685 S.W.2d at 20).

interest.[8]  TEX. FAM. CODE ANN. § 161.001 (West Supp. 2011); *C.H.*, 89 S.W.3d at 23; *In re J.L.B.*, 349 S.W.3d 836, 846 (Tex. App.—Texarkana 2011, no pet.).  The clear-and-convincing burden of proof[9] has been defined as "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."  *C.H.*, 89 S.W.3d at 23; *see* TEX. FAM. CODE ANN. § 101.007 (West 2008); *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009).  Thus, in reviewing termination findings, we determine whether the evidence is such that a fact-finder could reasonably form a firm belief or conviction about the truth of Davis' allegations.  *C.H.*, 89 S.W.3d at 25.

In a legal sufficiency review, termination findings are given appropriate deference.  *See J.F.C.*, 96 S.W.3d at 266; *Smith v. Tex. Dep't of Protective & Regulatory Servs.*, 160 S.W.3d 673, 679 (Tex. App.—Austin 2005, no pet.).  In such cases, we consider all the evidence in the light most favorable to the findings to determine whether the fact-finder could reasonably have formed a firm belief or conviction that the grounds for termination were proven.  *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005); *J.F.C.*, 96 S.W.3d at 266; *J.L.B.*, 349 S.W.3d at 846.  We assume that the fact-finder resolved disputed facts in favor of the finding if a reasonable fact-finder could do so and disregard evidence that the fact-finder may have reasonably disbelieved or whose credibility may reasonably be doubted.  *J.P.B.*, 180 S.W.3d at 573.  We also disregard all evidence that a reasonable fact-finder could have disbelieved.  *Id.*

---

[8]As noted, the best-interest prong is not challenged on appeal.

[9]Due process demands this heightened standard.  *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002).

The inquiry in a factual sufficiency review is "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of [Davis'] allegations." *C.H.*, 89 S.W.3d at 25; *see J.L.B.*, 349 S.W.3d at 846. We consider whether disputed evidence is such that a reasonable fact-finder could not have resolved that disputed evidence in favor of its finding. *C.H.*, 89 S.W.3d at 28. If, in weighing the disputed evidence, the fact-finder could have reasonably resolved the conflicts to form a firm conviction that Davis' allegations concerning the grounds for termination were true, then the evidence is factually sufficient and the termination findings must be upheld. *Id*. at 18–19; *see also J.F.C.*, 96 S.W.3d at 266. In applying this standard in light of the "clear and convincing" language required by Section 161.001 of the Texas Family Code, we must be careful not to "be so rigorous that the only fact-findings that could withstand review are those established beyond a reasonable doubt." *In re R.A.L.*, 291 S.W.3d 438, 443 (Tex. App.—Texarkana 2009, no pet.) (quoting *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006)).

Only one predicate finding under Section 161.001(1) of the Texas Family Code is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest. *A.V.*, 113 S.W.3d at 362; *In re K.W.*, 335 S.W.3d 767, 769 (Tex. App.—Texarkana 2011, no pet.); *In re N.R.*, 101 S.W.3d 771, 775 (Tex. App.—Texarkana 2003, no pet.). "If multiple predicate grounds are found by the trial court, we will affirm based on any one ground because only one is necessary for termination of parental rights." *K.W.*, 335 S.W.3d

at 769.   The grounds alleged in Davis' petitions are specified in Section 161.001(1)(D), (E), and (R).   We conclude that ground (E) is sufficiently proven.

Ground (E) alleged that Amanda engaged in conduct which endangered the physical or emotional well-being of I.H.R.   Endanger "means to expose to loss or injury."   *In re N.S.G.*, 235 S.W.3d 358, 367 (Tex. App.—Texarkana 2007, no pet.) (citing *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)).   This statutory ground for termination "refers only to the parent's conduct, as evidenced not only by the parent's acts, but also by the parent's omissions or failures to act."   *Id*. at 366–67 (quoting *In re S.K.*, 198 S.W.3d 899, 902 (Tex. App.—Dallas 2006, pet. denied)).

"The conduct to be examined includes what the parent did both before and after the child was born."   *Id.*   "To be relevant, the conduct does not have to have been directed at the child, nor must actual harm result to the child from the conduct."   *Perez v. Tex. Dep't of Protective & Regulatory Servs.*, 148 S.W.3d 427, 436 (Tex. App.—El Paso 2004, no pet.) (citing *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 84 (Tex. App.—Dallas 1995, no writ); *N.S.G.*, 235 S.W.3d at 367).   Termination under this ground must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *Perez*, 148 S.W.3d at 436 (citing *In re K.M.M.*, 993 S.W.2d 225, 228 (Tex. App.—Eastland 1999, no pet.); *Boyd*, 727 S.W.2d at 533; *N.S.G.*, 235 S.W.3d at 367.   "The specific danger to the child's

9

well-being need not be established as an independent proposition, but may be inferred from parental misconduct." *Id.*; *In re N.K.*, 99 S.W.3d 295, 300 (Tex. App.—Texarkana 2003, no pet.).

"[C]onduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child. Drug use and its effect on a parent's life and h[er] ability to parent may establish an endangering course of conduct." *J.L.B.*, 349 S.W.3d at 348 (quoting *N.S.G.*, 235 S.W.3d at 367–68); *see Perez*, 148 S.W.3d at 436.

Amanda's mother, Gail Parkhill, testified that Amanda had a problem with substance abuse since the age of fourteen. In the past, Amanda had been arrested for driving under the influence of marihuana several times, as well as driving while under the influence of Ambien, had been addicted to prescription medication, and had crossed the border to Mexico to fill false prescriptions forged on her doctor-grandfather's stolen prescription pad. In addition to alcohol, marihuana, and prescription medication, Amanda had admitted to Gail her use of heroin, other opiates, and crack cocaine. While Amanda would abstain from drug use after periodic spells in drug rehabilitation, Gail testified, "[S]he always went back to it."

When Amanda became pregnant, Gail inquired about her drug problem. Gail noticed she still "would fall asleep talking to you. She would miss the seat. You know, things that it would be obvious she was not -- not in control of herself. She at that time then really quit seeing me very much." Mitch Gilbert, who also supervised child visitation, also testified Amanda slept through her visits several times. Amanda admitted to falling asleep during a visitation because she was

10

"coming off drugs." Amanda's doctors recommended drug counseling, but she failed to seek treatment.

After I.H.R. was born, Gail found that the house Amanda was renting from her was "filthy," and "infested with fleas" due to the presence of two malnourished cats who Gail described as "skin and bones." Gail evicted Amanda on also finding "needles, lots of needles hidden" in the home. I.H.R. was released from the hospital to Amanda. Several weeks thereafter, she was removed by Child Protective Services and placed with Davis due to suspected drug use. Amanda started using crack cocaine "again around . . . before Christmas of . . . 2010." "Four or five weeks" before the termination hearing, Amanda told Gail she did not have "any place to go, that these people were kicking her out on the street."

Judith Lyle Flavin, a teacher at a junior college, testified that she had "known Amanda since she was 17" and that she had a problem with drugs. Flavin attempted to assist Amanda after I.H.R.'s birth, but decided it was of no avail after discovering Amanda was taking methadone and had been arrested after police found marihuana and drug paraphernalia in her home. Flavin testified that Amanda was filling a prescription for Methadone subsequent to her release from jail, but was selling it to people to make money. Flavin told the court that, after her release,

> we had great hope that she would be improved, but she would -- on a few instances she would come to my house, and she would just collapse . . . and want to sleep. And I would say, Amanda, what have you taken, because she would just barely be coherent. And she would say, I'm just taking my prescriptions. But her prescriptions, if that were all she was taking, they were having a real serious effect on her ability to function.

11

Eventually, Amanda admitted to Flavin that she had been to a drug dealer's house to get crack cocaine, that she had been using crack cocaine, and that she was suicidal.

Amanda testified that she was living at "Models of the Maker" shelter for the third time. She was able to obtain employment briefly with Court Appointed Special Advocates, but "was on drugs" and was fired. She admitted to prostituting herself in order to obtain drugs, with the most recent occurrence taking place one month before the termination hearing. Amanda agreed at the hearing that she was in no condition to provide a home to the child and could not currently support I.H.R. She admitted that she had been using crack cocaine "[o]n and off for a year and two months" and that her last use of the drug was two weeks before the termination hearing. When asked if her conduct was dangerous to the child, Amanda replied, "I think that if I had her with me, of course. All of my visits have been supervised. I've not been using right before my visit or during my visit or anything like that." She further stated that she was not in a position to care for the child and that she was "not here trying to get her back. I'm not here even trying to get visitation with her. I'm here just because I don't want to be excluded altogether from her life." Amanda admitted that she smoked marihuana the day before the child was born and that she used it throughout her pregnancy. She also agreed that I.H.R. was born addicted to methadone and marihuana, that it caused I.H.R. problems, and that I.H.R. "had a seizure right after she was born."

We find the evidence both legally and factually sufficient to support the finding that Amanda engaged in conduct which endangered the physical or emotional well-being of I.H.R.

Because only one predicate finding under Section 161.001(1) of the Texas Family Code is necessary to support a judgment of termination, and since Amanda does not challenge the best-interest finding, we overrule her points of error complaining of insufficient evidence.

We affirm the trial court's judgment.


Josh R. Morriss, III
Chief Justice

Date Submitted:    March 8, 2012
Date Decided:     March 9, 2012

13